UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN


JOHN G. KRUSE and MARIE KRUSE,
for herself and others similarly situated,

Plaintiffs,

v.

REGINA CAELI, INC., a foreign
not for profit corporation; RICH BECKMAN,
PETER IDLER; DANIEL SAEGAERT;
STEVE KONSIN; NORBERT MADUZIA;
AUGUSTINE TRAN; and JOSHUA ALLEN,

Defendants.

Case No. 16-10304
**JURY TRIAL DEMANDED**

_____

**<u>FIRST AMENDED COMPLAINT AND JURY DEMAND</u>**

John G. Kruse and Marie Kruse state as follows for their First Amended Complaint and Jury Demand against Regina Caeli, Inc. ("RCA"), Rich Beckman, Peter Idler, Daniel Saegaert, Steve Konsin, Norbert Madzuia, Augustine Tran and Joshua Allen:

**<u>Parties and Jurisdiction</u>**

1.      RCA is a foreign not for profit corporation authorized to conduct business in the State of Michigan.  Georgia is RCA's state of incorporation and the location of its principal place of business.

2.      RCA runs a tutoring program for homeschoolers at Sts. Cyril & Methodius Slovak Catholic Church in Sterling Heights ("Detroit Program").  RCA is engaged in interstate commerce within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

3.      Rich Beckman, Peter Idler, Daniel Saegaert, Steve Konsin, Norbert Maduzia, Augustine Tran and Joshua Allen (jointly, "Directors") are each members of RCA's Board of Directors.  On information and belief, none of the Defendants is a citizen of the State of Michigan.

4.      Mr. and Mrs. Kruse are residents of Oakland County, Michigan and citizens of the State of Michigan.

5.      Jurisdiction is proper under 28 U.S.C. §§ 1332 and 1331.   The plaintiffs are citizens of the State of Michigan and each of the Defendants is a citizen of a different state.  Plaintiffs are seeking damages in excess of $75,000.

6.      Venue is appropriate in this court because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### Background Facts

1.      Mr. and Mrs. Kruse are parents of eight children whom they homeschooled with the assistance of RCA's tutoring program.

2.      Mrs. Kruse also was employed by RCA as a math tutor.

3.      RCA summarily dismissed Mr. and Mrs. Kruse and their eight children from the Detroit Program on December 16, 2015, the eve of the last day of school before Christmas break – the students' "Game Day" – which the Kruse children had been preparing for and expecting to enjoy.

4.      RCA also terminated Mrs. Kruse's employment in retaliation for her and her husband's threat to file suit to report the illegal practices in which RCA is engaged.

**A.      RCA's Program.**

5.      On its publicly available website, RCA touts itself as:

> a private, independent tutoring center operating in the Catholic tradition. We offer pre-school through twelfth grade classes that meet twice a week. We are committed to faithful adherence to the Holy Magisterium of the Roman Catholic Church and particular obedience to the Holy Father. Regina Caeli is a response to the need for affordable, authentic, classical education taught in light of the Catholic tradition.

6.      In fact, RCA is run like a cult, where complete, blind, unquestioning obedience to RCA's officers and the Directors is demanded or the family is subjected to humiliation, ostracization and expulsion.

7.      RCA charges tuition to its students for a twice per week "drop off" program.  In addition to tuition, RCA charges its families a "Family Fund Raising Fee" in an amount to be determined by RCA's board.  The Fund Raising Fee is

mandatory and not optional.   RCA also offers families a discount in excess of 20% of the tuition cost, if a member of the family agrees to work for RCA.

8.    The parents who agree to work for RCA to receive the discount are either paid a nominal wage (which, upon information and belief, is below the minimal threshold of $8.15 per hour) and are forced to serve as "volunteer" assistant tutors or childcare providers.

9.    RCA also advertises itself as a §501(c)(3) non-profit organization and, contrary to its representations to current and prospective families, characterizes itself as a "school" in its IRS Forms 990.

10.    RCA is not a "school" because it does not meet the requirements of Regulation 179(b)(1)(A)(ii) and Rev. Proc. 75-50.   It does not have a regular faculty of qualified teachers.   Rather, RCA's "faculty" consists of RCA member-parents working as tutors in order to secure a tuition discount.   Most of the educational activities for RCA members take place in the home and not at an RCA facility.   In its marketing materials, RCA insists that it is not a "school," a factor which is significant to the homeschooling community to which RCA markets its services.

## B.    An RCA Parent Uncovers Financial and Operational Issues at RCA.

11.    RCA asked the father of two children enrolled in RCA's Detroit Program to serve as a sponsor for RCA's "Fabulous Fathers" fundraising event.

The father agreed and donated $7500 and RCA listed his company on its website as a "national sponsor" for RCA's principal fundraising event.

12.    RCA then asked this parent to assist it in raising funds through his many contacts in the Detroit area philanthropic community.  The parent agreed, but asked to review financial information about RCA so he could assure potential donors that their contributions would be well spent.  His request was turned down immediately and his donation returned.

13.    In a phone call from Director Konsin the parent was questioned as to his motives for wanting the financial information and indicated that it was not RCA's "style" to provide any financial information, other than the IRS form 990's, which were publicly available.

14.    The parent also learned that it was not RCA's "style" to maintain its registration with the Michigan Attorney General under MCL 400.273.  RCA registered in 2014 as a charity that intended to solicit funds in Michigan and took advantage of a one-time exemption from providing the Michigan Attorney General with the financial documents the RCA parent was seeking.  RCA allowed its registration to lapse but continued to solicit funds in Michigan without providing the requisite financial information.

15.    When this issue was raised with RCA's counsel, RCA's counsel indicated that RCA was "working on" bringing itself into compliance with

Michigan law and reiterated RCA's position that it would not provide any information other than its 990 tax forms.

16.    RCA also refused to explain the significant discrepancies and errors in the 990 tax forms, including any explanation for why it listed itself as a "school" on its tax forms, but insisted in its communications with RCA families and prospective families that it was not a "school" but a tutoring service to assist families who homeschool their children.

17.    In addition to these issues, RCA wrongly suggests to parents that their mandatory donations (which are in addition to and separate from tuition payments) are tax deductible and encourages RCA families to have relatives make the required tuition payments because the tuition then may be tax deductible.  Given the amounts RCA pays to professionals, it knew or should have known that these suggestions were contrary to law.

18.    Likewise, RCA offers a tuition discount of more than 20% to families who agree to tutor or otherwise assist in the program.  RCA does not inform the families that such discounts may constitute income subject to federal and state income and related taxes.  Discovery will establish whether RCA reports this income earned by its families and whether it pays its share of taxes associated with this income.

19.     Finally, RCA requires its paid-tutors to "volunteer" as assistants of childcare providers when they are not tutoring.

**C.      Plaintiffs become concerned with RCA's operations and threaten suit.**

20.     Other RCA families, including Mr. and Mrs. Kruse, also became concerned that RCA was not being run properly and that its actions were inconsistent with its stated goals and charitable purpose.   The families were expected to engage in significant fundraising, but it did not appear that the Detroit Program was receiving any benefit from the fundraising.   Rather, RCA was excessively parsimonious in running the Detroit Program, to the detriment of the students and their families.   Any parent who questioned RCA's lack of proportionate financial support for the Detroit Program was harshly criticized by RCA staff, and accused of attacking RCA and pressured to leave the program.

21.     Moreover, once the Detroit families learned that RCA owned a building in Atlanta, they asked whether their contributions were being used to pay for that building, and were told (falsely) that the Atlanta families had guaranteed the debt for the building and, alternatively, that only the Atlanta families were contributing to the costs of that building.   RCA later justified the purchase of the building as necessary to house RCA's administrative staff, but half of the administrative staff, including its Director of Education, do not work in Atlanta.

22.     RCA also made misrepresentations to Mrs. Kruse in connection with her employment as a tutor.  Over the summer of 2015, Mrs. Kruse endured a grueling six-week program sponsored by RCA in order to obtain a "Master Tutor Certification."  RCA told Mrs. Kruse that she would be paid more if she obtained the Master Tutor Certification and that she would have first selection in tutoring assignments.  Although RCA relented and told Mrs. Kruse she passed the program, she did not receive the promised certification of completion, raise or her choice in tutoring assignments.

23.     Mrs. Kruse was also instructed not to talk about this or any other issue she had with RCA (like not having enough money for supplies) with anyone other than the regional director of RCA.  Private discussions between families in the Detroit Program or other employees about RCA are strictly forbidden and treated as an act of disloyalty, warranting a reprimand or expulsion.

24.     On December 13, 2015, Mr. Kruse, frustrated with the lack of meaningful information about RCA's finances and operations and inconsistent explanations about the use of charitable donations and upset with the way his wife was treated by RCA, sent an email to other RCA families raising concerns about whether the massive debt RCA assumed in order to build its Atlanta facility endangered RCA's accreditation due to its obvious fiscal irresponsibility.  Mr. Kruse also questioned the propriety of RCA's demands that the families in the

Detroit Program continue to raise funds when RCA refused to provide the basic financial information that would allow the RCA families to determine whether the funds they raised were being well used.  Mr. Kruse's email specifically referenced RCA's violation of Internal Revenue Regulations 301.6104(d)-1 through 3.

25.    In the email, Mr. Kruse indicated that he and Mrs. Kruse intended to "join a legal action" to address these issues, if RCA did not provide the financial information necessary to bring it in compliance with federal law.

26.    In response, RCA immediately blocked Mrs. Kruse's access to RCA's Google Apps Account, effectively terminating her employment as a tutor.

27.    RCA also attempted to intimidate Mr. Kruse from asking questions about RCA's finances by engaging its counsel to threaten Mr. Kruse with litigation for making the communications to the other RCA families and to falsely accuse Mr. Kruse of obtaining the email addresses illegally.

28.    RCA also sent several emails to the recipients of the Kruse's email, falsely stating that the representations in the Kruse email were "inaccurate and without merit."

29.    Finally, three days after Mr. Kruse sent the email in which he and Mrs. Kruse threatened to sue RCA because of its violation of federal law, RCA "dismissed" the Kruse family from RCA's programs.   The dismissal was communicated by email, with the ironic and sacrilegious suggestion that it was

being sent "A.M.D.G." or "for the greater glory of God."  The eight Kruse children were prohibited from attending the pre-Christmas break Game Day scheduled for December 17, 2015, the day after RCA – "for the greater glory of God" - and kicked them out of their tutoring sessions.

30.    The dismissal letter contained patently false and pre-textual reasons for the termination.   In language favored by cults, one of the reasons RCA offered for the termination was the Kruses' alleged effort to "create discord and disunity in the community.

31.    RCA's decision to terminate Mrs. Kruse's employment and remove her eight children from the RCA program on the eve of the Christmas party caused Mr. and Mrs. Kruse to endure significant and severe emotional distress.

## COUNT I–
## VIOLATIONS OF THE WHISTLEBLOWERS PROTECTION ACT
## RCA AND THE DIRECTORS

32.    Mrs. Kruse incorporates the preceding paragraphs.

33.    Mrs. Kruse was an employee under MCL 15.361(a) and RCA and the Directors are each an employer under MCL 15.361(b) and Michigan law.

34.    The December 13, 2015 email was a "protected activity" under the Whistleblower Protection Act ("WPA") because, in the email, the Plaintiffs threatened to report RCA's violation of the laws of the United States to a public body.

1799009 v2

10

35.    RCA, through each of the Directors, terminated Mrs. Kruse's employment and otherwise discriminated against her on the privileges of her employment in retaliation for the December 13, 2015 threat to report RCA's violation of federal tax laws and other laws to a public body.

36.    As a result, Mrs. Kruse has suffered actual damages in the form of lost wages, lost tuition discounts, emotional distress and other economic and non-economic damages, including costs and damages attendant to having her children removed from the Detroit Program.

WHEREFORE, Marie Kruse prays for judgment in her favor and against each of the defendants in an amount sufficient to compensate her for all of her actual damages, for her attorneys' fees, costs and interest.

## COUNT II – FRAUD – ALL DEFENDANTS

37.    Plaintiffs incorporate the preceding paragraphs.

38.    RCA, through materials and procedures that were, on information and belief, drafted or approved by the Directors, made the following misrepresentations to Plaintiffs and others, in an effort to secure Plaintiffs' participation in RCA's tutoring program:

> a.    RCA was not a "school."  This representation was important to Plaintiffs because they consider homeschooling a vocation. Defendants are familiar with the importance of this to the

homeschooling community and knew that, if Plaintiffs and
others knew that RCA was describing itself as a "school" to the
IRS and others, Plaintiffs would not have participated in the
program.

b.    Mandatory "donations" were tax deductible.

c.    Money raised in the Detroit area would be dedicated to the
Detroit program;

d.    "Degreed tutors at RCA teach a full college classical preparatory
curriculum."  The only qualification for tutoring at the Detroit
center was that the tutor be an RCA parent.

e.    Family members pay RCA members' tuition and mandatory
contributions and deduct these payments from their taxes.

f.    "As the inevitable struggles and frustrations arise from the
vocation to homeschool, the RCA community exists to help with
resources, community, and prayers."  RCA's actions added to the
struggles and frustrations Plaintiffs' experienced in their vocation
to homeschool by, *inter alia,* removing the Kruse family from the
program abruptly and without cause

39.     In addition, RCA failed to properly account for and pay wages owed Mrs. Kruse and others for mandatory "volunteer" time and for the tuition discounts.

40.     Plaintiffs have been injured by these actions in that they enrolled their children in the fraudulent program, may owe taxes that were not properly withheld and suffered other economic and non-economic damages.

WHEREFORE, Mr. and Mrs. Kruse pray for judgment in their favor and against each of the Defendants in an amount sufficient to compensate them for all of their actual damages, for their attorneys' fees, costs and interest.

## COUNT III
## VIOLATIONS OF THE FAIR LABOR STANDARD ACT
## 29 U.S.C. §201, et seq. – RCA

41.     Mrs. Kruse hereby incorporates the preceding paragraphs.

42.     This claim arises out of RCA's failure to pay Mrs. Kruse the minimum wage for time she as forced to work as an unpaid "Assistant" or to provide childcare.

43.     Under 29 U.S.C. §206(a), Mrs. Kruse was entitled to be paid a minimum wage for the hours she worked as a tutor and the hours she was required to work as an assistant to other tutors or in childcare.

44.     This "volunteer" work was mandated by RCA, Mrs. Kruse's employer, but she received no compensation for this work.  Other people employed

by RCA as tutors in its various centers were also required to volunteer and paid less than minimum wage.

45.    Mrs. Kruse brings this action on her own behalf and, pursuant to 29 U.S.C. § 216(b), on behalf of similarly situated RCA current and former employees.  Specifically, Mrs. Kruse brings this action on behalf of all RCA employees who, during the limitation period, were forced to "volunteer" for RCA as assistant tutors or childcare providers.

46.    The common questions of fact and law include: whether RCA failed to pay its tutors minimum wage; whether RCA's policy and practice of requiring tutors to work as unpaid assistant tutors or child care providers violates the FLSA; whether RCA failed to record the actual time worked by RCA tutors; and whether RCA failed to maintain records of the actual time worked by RCA tutors.

47.    Mrs. Kruse seeks backpay for all hours she was required to work for less than minimum wage, hours she was forced to work as an assistant or to provide childcare, liquidated damages, her attorneys' fees and costs, as provided by 29 U.S.C. §216(b).

WHEREFORE, there being no just cause otherwise, Mrs. Kruse, on her own behalf and on behalf of those similarly situated, seeks damages in an amount sufficient to compensate her for violations of the FLSA, including back pay, liquidated damages, attorneys' fees and costs.

## COUNT IV–
## VIOLATIONS OF THE MICHIGAN
## <u>CONSUMER PROTECTION ACT – RCA</u>

48.     Plaintiffs hereby incorporate the preceding paragraphs.

49.     RCA solicited donations from Mr. and Mrs. Kruse and they made significant donations based on those solicitations.

50.     RCA's actions violated subsections (c), (n) and (bb) of Section 3 of the Michigan Consumer Protection Act ("MCPA"), MCL 445.903, in the following respects:

    a.    RCA was not authorized to solicit charitable donations in the State of Michigan in the fall of 2015;

    b.    RCA instructed RCA families that part of the tuition requirement was characterized as "fundraising" so that families could take a tax deduction for part of their tuition payments under §501(c)(3);

    c.    Failing to inform RCA families that the tuition discount it offered employees may be taxable income;

    d.    Suggesting that families could have their relatives take tax deduction for tuition payments made on behalf of an RCA participant;

    e.    Indicating that funds raised in Detroit would be dedicated to the Detroit facility;

    f.    Indicating that RCA's headquarters was donated to the organization when it was purchased through debt that was, on information and belief, financed through charitable donations; and

    g.    Hiding expenses (including "student travel" expenses), the salary paid to the executive director and other financial information on intentionally obtuse 990 forms and refusing to provide any clarifying information.

51.    On information and belief, discovery will disclose additional violations of the MCPA.

52.    The disclosures, if any, concerning the tax status of contributions were misleading and insufficient under the circumstances.

53.    Mr. and Mrs. Kruse have suffered actual injuries as a result of RCA's violations, including donations procured through fraud, unanticipated tax liability and emotional distress.

WHEREFORE, Mr. and Mrs. Kruse seek judgment in their favor and against RCA in the form of:

1799009 v2

16

a.  An injunction barring RCA from soliciting donations in the State of Michigan based on misrepresentations concerning how the funds would be spent;

b.  An injunction requiring RCA to make publicly available detailed financial information, including information on executive compensation; "expenses,"; travel expenses; and information concerning the loan procured for RCA's headquarters;

c.  A declaration that RCA violated the MCPA; and

d.  A judgment awarding Mr. and Mrs. Kruse their actual damages and attorneys' fees and costs.

## COUNT V – DEFAMATION – RCA

54.  Mr. Kruse hereby incorporates the preceding paragraphs.

55.  When Mr. Kruse invited other RCA families to participate in a meeting to discuss some of their common concerns over RCA's lack of financial transparency, dubious stewardship over donated funds and bizarre restrictions on communications between families in the Detroit Program, RCA falsely accused him of obtaining information illegally and of making statements without validating the facts.

56.     RCA also communicated to RCA families that Mr. Kruse lied in the December 13, 2015 email, when he did not.

57.     Mr. Kruse's reputation has been damaged as a result of RCA's vicious and unfounded accusations and he has suffered additional actual damages.

WHEREFORE, there being no just cause otherwise Mr. Kruse asks for judgment in his favor and against RCA in the form of an order awarding him actual damages, interest and costs.

## <u>COUNT VI – INJUNCTIVE RELIEF - RCA</u>

58.     Plaintiffs hereby incorporate the preceding paragraphs.

59.     RCA raised charitable donations by making false representations to potential donors like Plaintiffs, including:

     a.     Mislabeling tuition payments and program fees as charitable donations;

     b.     Instructing RCA families to tell their family members to make charitable donations in order to satisfy the families' tuition obligations;

     c.     Informing families in the Detroit Program that their donations would be dedicated for us in connection with the Detroit Program;

      d.     Failing to treat the tuition discounts offered to employees as taxable income, thereby exposing both RCA and those employees to unnecessary tax liabilities;

      e.     Informing families that RCA's corporate headquarters was donated and, alternatively, that the debt incurred to purchase the property was guaranteed by families in the Atlanta program.

60.    Plaintiffs' efforts to ensure that their donations were used appropriately and as represented were met with derision.

61.    On information and belief, RCA used charitable donations for improper purposes (including funding trips for RCA staff and their families) and in ways contrary to what was represented (including servicing the debt for the headquarters).

62.    Unless enjoined, RCA will continue to solicit charitable donations based on false statements, like those made to Plaintiffs.

WHEREFORE, Plaintiffs respectfully ask the Court to enter an order:

      a.     Directing RCA to account for the charitable donations raised in Michigan;

      b.    Enjoining RCA from soliciting charitable donations in Michigan.

Respectfully submitted,

By:   */s/ Kathleen H. Klaus*
        Kathleen H. Klaus (P67207)
        MADDIN HAUSER ROTH & HELLER, P.C.
        *Attorneys for Plaintiffs*
        28400 Northwestern Hwy, 2nd Floor
        Southfield, MI  48034
        (248) 359-7520
        kklaus@maddinhauser.com

Dated:  February 26, 2016

## **JURY DEMAND**

Plaintiffs request a trial by jury regarding their Amended Complaint.

By:   */s/ Kathleen H. Klaus*
        Kathleen H. Klaus (P67207)
        MADDIN HAUSER ROTH & HELLER, P.C.
        *Attorneys for Plaintiffs*
        28400 Northwestern Hwy, 2nd Floor
        Southfield, MI  48034
        (248) 359-7520
        kklaus@maddinhauser.com

Dated:  February 26, 2016